Good morning, and continuing the morning's arguments, the case that we're now working on is 2010-11-21 HONEYWELL INTL v. NOKIA CORP. Mr. Leff. Good morning, Your Honor. May it please the Court, Martin Lewick for Plaintiff Appellant HONEYWELL. The District Court made two errors below. The first was entering summary judgment against Honeywell of on-sale bar where there were disputed issues of material fact in which the Court resolved the reasonable inferences against Honeywell and not against the moving party, as it should have done. There were two issues presented there. One is whether the specific embodiment of the claim was actually the subject of an offer, and the second was whether there was a firm and definite offer as a matter of fact under this Court's articulated standard in Group 1 and subsequent cases. Now, the second error below was in claim construction, where the Court imported words not found in the intrinsic record, rotating just enough but not more to modify the claim language slight misalignment. I'd like to address principally the issue of the on-sale bar, and it's a very complicated record, and I think when the Court looks at this case, they're going to see, as my opponents stand up and make their presentations, a point-counterpoint sort of overall patina to this case. And the two points I would like to make, the first, that there was never an embodiment of Claim 3 which required a two-lens array directional diffuser that the Court could identify in the document that it found to be the offer. But I don't think that's required, is it? If there is an offer, if there is a definite offer, then it's not necessary, is it, to communicate to the offeree exactly what it is that's intended to be sold? Well, I think it is necessary as a matter of fact, particularly in this instance, Your Honor, because what this overall contract was for was the revolutionary recreation of an aircraft cockpit. Not just a display, but everything that was going to go into that cockpit. But the offer included provisions calling for a display, correct? Provisions calling for a display, but no one knew what that display was going to be at the time the contract was awarded. Well, but the Ames Agreement did specify a display, and it did call for demonstration units. Is that correct? Well... Just in the statement of work, there was some requirement for demonstration units. Yes, that's right. There was a requirement for demonstration units, but what that unit was going to be and how it would interplay with the rest of the cockpit was unknown. That's really what the contract was for. Well, the display that is set forth in Claim 3 was reduced to practice. There seems to be no debate about that, correct? That is correct. And that display was demonstrated to Boeing, was it not? In connection with another contract, it was demonstrated to Boeing, a working model of a display that had all of those elements of Claim 3. So the question I have is, why is there any genuine issue of material fact that the Ames contract encompassed whatever displays Honeywell had available at the time that it could sell, that it could provide to Boeing should Boeing make such a request, including the units that were demonstrated? Sure. Let me just... I'm not going to try to make this answer complicated, but it is a little bit. Alright, so what happened? There's a statement of work, Honeywell responds to it with its Honeywell's proposal, and that proposal is simply an offer of capability to do the work. Then the contract starts. Let me just interrupt, because it's not just an offer of capability to do some work. It does specify different deliverables, it specifies prices, it specifies all sorts of parameters that were set forth in this report's opinion. Now, it did not say the particular display unit specified in Claim 3, that's clear. But I don't know that that's necessary given all of the evidence that was before the district court. I think it is necessary, and I think you're getting right to it, at the specify. The proposal does not specify the display. What it does is it is an offer for capability. I can cite you to testimony from Boeing's 30B6 on that. But here's what Boeing's 30B6 representative said about specifying. And this is at volume 3 of the appendix A06362. And then there's an administrative agreement, which is how the engineers work together and the kinds of deliverables by date that you want to see from them. And then the specification control drawing, which ultimately defines the product that they're going to deliver. Bear with me for just one moment. That takes place more than a year after this proposal. And I'd like to point the court directly to one document that I think shows quite clearly the point I'm trying to articulate on this. And that would be in the appendix at A07337. A07337? Yes. And that's in volume 4, Your Honor. And that's the transmittal of this document I just referred to, the specification control drawing. And I'll give the court just a moment to find it. Okay. Proceed. That's dated March 18th of 1991. This is the Honeywell proposal of June of 1990. And if you look, this is the transmittal of the preliminary AIMS SCD. So if you look at the very bottom, what it says is it is intended that this preliminary SCD will allow Honeywell to proceed on schedule into the early stages of hardware and software design while continuing to work with the AIMS project group and firming up AIMS system requirements. So to your point, Your Honor, what I would say about the question of specifications, think of it as Honeywell had some working models that showed they could tailor the luminance profile of light, but they by no means had a deliverable that anyone knew would work for an aircraft cockpit because it was going to be more than a year before Boeing even specified what the requirements of such a device would be. So what I'm saying is there's no way there could have been a device that could have been offered for sale at the time. And that goes right to the heart of the disputed issues of material fact. We're not suggesting to the court that the court should enter summary judgment on Honeywell's behalf that there could be no on-sale bar. But I believe that upon a fair trial and an explanation of how these contracts fit together, the effect issue as to whether there was a definite offer to sell that device, and even under the court's, I think, flawed conclusion that the proposal wasn't offered for a device, none was offered at that time. And so if you follow forward in this contract, you'll see it was actually after the bar date on April 21 of 1992, about nine months after the bar date, that actual designs were put on the table for Boeing to evaluate and look at to see if those might meet their overall specifications. And remember, they're trying to tie together everything in the aircraft to this management system. Fly-by-wire, the entire information management system. So when this SCD that I'm referring to goes out, this covers really an entire cockpit design. And the specific module has to go into that. Now ultimately, in April of 1992, after the bar date, when Honeywell put some actual proposed solutions to the problem on the table, this two-lens array directional diffuser didn't meet Boeing's needs. And it was rejected, and they went with a different solution. That wouldn't make any difference if, in fact, they had offered for sale the two-lens unit. I would agree with that if, in fact, they had done it. But the simple reality is that's disputed because until there was a specification, no one could know what would be solved. So thinking of it in a different way, let me also... Well, is that the best evidence? I mean, you say it's disputed, but we have to determine here whether there's a material issue in dispute here. And what you say is disputed is whether anyone could have done it. Is that it? Is that the essence of your argument that with respect to the specification, they couldn't have known that this wasn't definite enough, this document wasn't definite enough? Is that what this comes down to? No, not really, Your Honor. I'm trying to get to the point of why I think there was not an offer, but there's an abundance of factual disputes as you lead up to that that I think are laid out in the brief. But one is, for example, Honeywell retained design authority through this entire process. That's in these contract documents. So if you just look at the issue of Group 1, was there a definite offer that the offeree could turn into a binding contract by simple acceptance? Absolutely not until you got to this point in time in April of 1992 where you reached something in the contracts called the preliminary design review. There would be no power of acceptance. So that's on one of the issues, which is not what was offered, but whether or not there was even an offer. That's correct. But I'm just focusing on what was offered. Okay. On the what was offered, let's go to what the district court found was the offer. The district court said it was the Honeywell proposal. Nowhere in that proposal, nowhere is there a two-lens array directional diffuser that would meet the limitations of Claim 3. And, in fact, the district court did not even apply its own claim construction of any specific environment. We have a concession of reduction to practice, but I do think that an important argument on your side seems to be that there were in existence the single, double, and triple lens. And at what stage was it resolved which of these might have been? The idea, if there was a lot in the briefs about whether Boeing could have accepted the offer that was made, accepting that an offer was made, and as to how that happens. But at what stage was it known that the preferred design was that which is in Claim 3? Yes, Your Honor. And that can be found in the record at Volume 4, Citation Appendix 07047 in the Ames Technical Coordination Meeting Minutes Number 93. The date of that is August 7 and 8 of 1991, after the bar date. And I will just read to Your Honor what the statement was exactly on this point. Honeywell evaluated a single, double, and triple tandem array lens and found the double tandem had the best results. And so that point in time that Your Honor is inquiring about, as to when did Honeywell come to the point of view that the best was a two lens array embodiment as opposed to a one or a three, was actually after the bar date in August of 1991. Well, it seems to me on that point, as I reviewed the record, and it's kind of difficult to discuss because virtually all of this stuff is more confidential, even the stuff that you're referring to here. But it seems to me there was uncontroverted evidence demonstrating that the DU-10 had the two lens directional diffuser. Can you point to me any evidence that you put on that the DU-10 did not? Well, I can't point to any that it did not because they can't point to any that shows how it was built. And so if I could just... Well, there's plenty of evidence going to that point. I mean, I don't know how it was built, but what was offered, what was in the spec. I mean, I think they had what appeared to me to be uncontroverted evidence that it did have a two lens directional diffuser, which I thought was what Judge Newman was questioning. Well, there is no evidence in this record showing what DU-10 looked like when it was built, Your Honor. I mean, there just is not... Well, what was it when it was proposed? Well, it was proposed at one point... That was what was offered. You keep on changing sort of the question to when it was built. Well, I'm not trying to change it. Okay.  Well, first of all, there's no evidence it was actually built the way it's said. Now, there are drawings. We don't dispute that, but that goes to a question of fact. Let me just address... Let me just address the how was it built issue because, remember, the court said that you have to rotate the lens. The lens array is just enough but not more. There's nothing in this record from which you could make a judgment as to whether that happened. And the court never applied its claim construction to it. So I do dispute whether DU-10 has lens arrays that meet the limitations of the claim. But beyond that, if you look in that Honeywell proposal, you will not find an offer of DU-10 or a dual lens array unit. What you'll find, everything in there is a one lens array unit or it's ambiguous as to what it was. And the inventor, McCartney, testified that at the time of the proposal, he felt a one lens array unit was the best solution. So there is a fact issue as to what was offered under that proposal, even if you find that is the offer. And that's what we're saying is that there ought to be a factual determination on those issues. Well, I think the question of law, which is troublesome to me, is that knowing that it was going to be one of these three, and an offer was made, and we have the policy principles behind the statutory bar of the on sale, how necessary is it that the offeror, it doesn't matter what Boeing knew, what the offeror knew, in terms of which was the best of these three? Well, I think that actually the policy favors what we're suggesting here for the following reason. The problem they're taking on is very complex. And where I take issue with the approach is that Honeywell knew that one of these would work. In fact, none of them worked. And so all they were saying was, we'll design it. We'll build it. We'll maintain it. We'll hold it in place for as long as these planes are in the air. But we don't know what it's going to look like until we know your specifications. That came a year later in the contract. So it's not the case that Honeywell knew that either the one, two, or three would be something they could sell, or that they had a device that would satisfy the various requirements and specifications that Boeing would ultimately come up with. And since Honeywell had retained the design authority over the actual deliverable, they did not have to deliver any specific device to Boeing at that time. There was no binding offer that Boeing could bind Honeywell to for a specific device. Okay. Let's hear from the other side. We'll save you a little time. Thank you, Your Honor. Okay, Mr. Korniski. Yes, Your Honor. Please proceed. First, Your Honor, we do not believe that this case is so complicated. I think one of the problems that we're having is that I think the facts that are being argued aren't the facts that exist in this case. Number one, one of the primary arguments that an appellant is making is that somehow there were these two different contracts, and different aspects of the development were conducted under one contract, and then this Ames proposal was a completely separate contract. That's not the case. I'd like to direct the Court to Exhibit A02025. I think let's get directly to the substance of what was offered and what was understood. Your Honor, what was offered was, in fact, the embodiment that was reduced to practice. How do we know that from the record? Well, we know it from the Ames proposal, Your Honor. The argument was that it's not addressed in the Ames proposal. I'd like to point the Court to this exhibit, A02025, where it specifically refers to DU Number 8. Hang on. What page? A02026 and A02027. And what we see is that these display units, DU Number 8, Number 9, and Number 10, which all included the identical directional diffuser. This was the claimed invention. We refer to it as a two-lens array. And you'll see at the bottom of page A02026, it refers to DU Number 10, it refers to DU Number 8, and it refers to DU Number 9. The record says that at the time this proposal was submitted, there was a preference for the single lens. So how are we to assume that which was offered to be sold was the lens which was not at that point the preferred one? And we don't have to assume that. First off, the Ames proposal at A02052, third paragraph, says that the display unit proposed, this is a quote, the display unit proposed for the 767X flight deck incorporates all of the technology improvements identified during the 7J7 IDS program, end quote. So, Your Honor, that's everything that went before. Number two, on that same- Well, if that was not the preferred system, then you're telling us to interpret this as saying they offered their system, which at that time was not preferred? Well, Your Honor, I guess what was preferred, I think all the inventors and several other witnesses from Honeywell testified that the only display units that were fabricated with the claimed directional diffuser that was demonstrated to Boeing and tested by Boeing were these display units number 8, 9, and 10. Okay, so that's unrefuted. In addition- Are they all the same array? Sorry, yes, that's correct. Number 8, number 9, and number 10 were all identical. And those were all set forth in the inventor Yakumovich's drawing. That drawing is in brief. And there's no evidence to the contrary There's no evidence to the contrary. In fact, Your Honor, if you look at the timeline leading up to the Ames proposal, we know that in January 1990, Honeywell formally decides, hey, we're going to fabricate a directional diffuser that we can demonstrate to Honeywell in May 1990. We then know from Yakumovich's testimony that by February 26, 1990, Honeywell had ceased testing the one lens array because the luminance profile that Honeywell was looking for required two lens arrays. We then know that in May 1990 is when Honeywell claims they had the reduction to practice. There are three documents or three pieces of evidence. That's 2-0-2-1. There's 6-6-2-8 to 2-9. And then there's 1-3-2-2 to 2-3. Those three documents outline and illustrate what is going into DU's number 8, number 9, and number 10, and it's the claimed invention. And McCartney, in one of these documents, is sending this drawing, and it says fabricate all three of these identically because we're going to demonstrate them to Bowen. Then McCartney testifies at his deposition that a directional diffuser with two lens sheets and rotation was demonstrated to Bowen before the Ames proposal was submitted. So that had to occur between about May and about June. So the timeline tells it all. Then we get the Ames proposal, and in it, it refers to these three devices. It also says that everything's included that had gone before. And it also refers to things like DU number 9, which it says we're going to have a deliverable by August 20th, which would be similar to either DU number 6 or DU number 9. DU number 9 is identical to the reduction to practice. We then know from Exhibit 6691 that Bowen, in fact, tested DU number 10. Again, DU number 10 is identical to DU number 9. So if you look at what happened before the Ames proposal, they said we're going to build this directional diffuser, and here's what it looks like. You look in the Ames proposal, and they're talking about these three directional diffusers. And then it says we're going to give you another one to test. So DU number 10 is then tested in, I think it was August or December. So, Your Honor, all of the facts. The district court found that this was not a tough question. He said that the overwhelming evidence shows that it was a two-lens array that was offered in the Ames proposal. Now, the argument that Honeywell makes in their brief is, no, it had to be the single-lens array. But that's not the issue here. It could have been. I mean, frankly, the Ames proposal could have offered a single lens, a double lens, and a triple lens. But one thing is clear and unrebutted is that the two-lens array was the one that worked the best. And I don't think it matters that it worked the best. It matters what was offered. But, in fact, it did work the best. It was the one that they built, the only one that they built, the only one that they gave to Boeing, and the only one that Boeing tested. And so the court found that certainly the Ames proposal was offering certainly at least the two-lens array. There's another argument that is made throughout the Honeywell briefs is it could not have been an offer because what was ultimately the final design had not yet been determined. But, frankly, that doesn't make sense because normally when you're trying to offer something for someone to incorporate into their design, the design, of course, is not final because they haven't decided what they're going to put into it. But if the design is not final, then where, at what point, does one have an on-sale of a particular design, which is what the bar is about? The on-sale occurs when the claimed invention is offered for sale. Well, we know that no bar arises if, in fact, the invention is not, as the FAF case says, ready for patenting, which means ready for use. And so doesn't there have to be adequate specificity to know precisely what is being sold? We offer something that has a certain amount of generalized capability for a certain price, but with sufficient precision to know what is being offered for sale. I think what it has to be is a claimed invention. Number one, the claimed invention doesn't have to be perfect to be offered for sale. Well, we have several claimed inventions here and different claims. There's one claim at issue here, Your Honor. Yes, exactly, but that one claim is limited to the double array. And I think there's no doubt that the offer, we'll call it that, did permit, contemplate the possibility, or certainly not eliminate, the single or even a triple lens. So at what point do we say, nonetheless, you had an obligation to enter into the patent system at that stage? I'm not sure I understand. Here, in this particular case, it was reduced, the only thing that was reduced to practice, the claimed invention, which was a two-lens array, was reduced to practice, and that satisfies the legal requirement that what is offered is, in fact, a claimed invention. You're saying that the single lens was not reduced to practice? I thought that came first. Well, I think it was a single lens, but I guess, I'm not sure I understand the question. I think what the court is asking is... The offer permits, I think, I thought you had all agreed, that the document, the Ames document, did permit providing either a single or a double or maybe even a triple. I don't know if that's what the Ames proposal, I mean, that's not the issue that we're promoting, but what I am saying is that the Ames proposal does say that it does include the two-lens array, which is the issue. What I am saying is that the Ames proposal does say that this proposal incorporates all the technology improvements, so I think that could be interpreted to include everything that had come before, and certainly what came before was a two-lens array, which was reduced to practice and tested and demonstrated by Bohm. I think saying all improvements is a little bit too general. But it does refer to, when you look at where the specifics are provided, it does refer throughout to DU number 8, number 9, and number 10. So, Your Honor, if you look at the entire timeline of what Honeywell is attempting to accomplish, it all points to one thing, and that is we're going to put together this two-lens array works best, and that was Yakimovich in February 1990. She stops testing the single-lens array, and the only ones that they build are the two-lens arrays. The only ones that are tested by Bohm are the two-lens arrays, and what was demonstrated to Bohm before the Ames proposal was a two-lens array. So there is no material or genuine issue of material fact here. Now, Honeywell can go ahead and argue, well, a single lens was offered. Okay. But that doesn't rebut the facts, the overwhelming facts, that the two-lens array was offered. And remember, this was two years before the patent application was filed. This wasn't just close to one year before the critical date. This was two years before the application was filed. Okay. Thank you. Thank you, Your Honor. Now, were you saving some time for Mr. Rosenthal? You've used up a fair amount of his time, but there's some left. I'm sorry, Your Honor, we were going to split the— I had seven up separately. I had him at seven and Mr. Rosenthal at eight. I know the red light had gone on, but we'll hear what you have to say for a few moments. Your Honor, Lawrence Rosenthal for Fujifilm. Defendants, I respectfully request more than a few moments, and I think I'd like to drag the discussion back to the on-sale bar, which, as Your Honor observed, carries with it a policy baggage. And what it asks is not whether the patented invention was sold, but whether it was offered for sale. And that's where Judge Farnan leashed his decision. He examined the overwhelming evidence, the factual evidence, and concluded that the two-lens array rotated 16 degrees, embodiment would cross the lens arrays, which was built for incorporation in 8, 9, and 10, was, in fact, offered for sale. And he evaluated all of the evidence, and whether or not— the two-lens array was still in the mix because it couldn't perform what Boeing was asking for. The two-lens array was certainly offered for sale, and that is the beginning and end of the legal analysis that you have to reach. If you can conclude that the two-lens array embodiment was, in fact, offered for sale— it doesn't matter whether it was actually bought two years later, but was offered for sale in this huge proposal called offer, the business terms of which are labeled price offering, it has a bidder's offer, it's all the language of a commercial offer for sale, satisfying Group One and FAF, then that's enough. Now, why is it that the single-lens array can't satisfy the Boeing requirements? In the statement of work, it said, not only do you have to give us a flat-panel display, but you have to give us a flat-panel display which permits a pilot and a co-pilot sitting side-by-side in a cockpit to view all of the displays. It required a wide horizontal viewing angle, and that was reflected in the Honeywell technical proposal repeatedly. I'm going to give you a cockpit display which permitted plus and minus 60 degrees of viewing angle in the horizontal direction. But, because I'm trying to save power and actually use the invention of the patent, I'm going to steal some of the light from the vertical viewing angle. I only need a plus and minus 45 degree viewing angle in the vertical direction because the pilot and co-pilot are fixed, sitting in chairs pretty much parallel to each other. I think we have these issues. Had you asked for a time to raise any other issues that are before us? Yes, Your Honor. Your Honor, I'd like to address the issue of the industry practice that there was no invention, that there was no actual offer because Honeywell could change it or Boeing could change it down the road. First of all, I think that it affects the public policy. This wasn't really raised in this argument by Honeywell. It is in the briefs. We appreciate it. Well, I think Mr. Lewick did raise that issue. Why don't you tell us what we need to know? Your Honor, it seems to me that we defeat one or two B if we permit this kind of analysis. In fact, the RCA case, by way of example, had a very similar set of facts where the invention was incorporated in the greater product which was going to be developed by RCA. You've got to focus back, and it's my contention, to the issue of offer for sale, what was offered. And what Honeywell offered was to produce a display that performed the functions that Boeing desired and had these characteristics. And what Judge Farnan did is he looked at all the evidence, testimony of the inventors, that one lens array was abandoned very early. Not abandoned. It was put in the back burner because it didn't work. Everybody focused on the two lens array. That's what Mr. McCartney instructed. Jekimowitz, please give me a drawing on May 14th, which is seven days after the statement of work issues. Please give me a drawing that I can send off to Japan so I can incorporate a directional diffuser into DU-89 and 10. And that's at 2-0-2-1. And on May 21, in DX-39, at 13-22, he transmits the drawing to JAE in Japan, who's going to assemble a liquid crystal module. But you're not saying that those transactions were an on-sale event, are you? No. Those transactions define what was being offered for sale. The on-sale is the technical proposal and the price-offering document, which was issued in June. That's the offer for sale. What these documents describe are the facts and circumstances which give definition to what was offered. As Your Honor pointed out, it doesn't have to say the invention of Claim 3 in the offer. But what it did do, it had a huge discussion, 10 or so pages, directed to the directional diffuser, defined as something that's on patent application. This is what we're going to offer you. And that directional diffuser discussion is a loaded discussion. It carries with it everything that came before, which the inventors testified to. Before, we had the revisionist testimony. After, we actually got the on-sale documents by Mr. McCartney, who said, I really always wanted just a one-lens array. That's contrary to what he had said a year earlier in deposition. So what we have here is the offer does describe something very vividly which performs the function. It was an offer. It can only be satisfied, it might have been satisfied maybe by a three-lens, but I don't think so, a two-lens array arrangement. And the testimony, the documents in that time frame help explain what the offer is. And the cases, Lacks is one. There are several cases which say that you don't have to, RCA was another, you're not limited to what the words of the offer say. You look at the facts and circumstances and evidence, the contemporaneous evidence, and that evidence is very strong and convincing. And the fact that Boeing in 2001 said Honeywell had considered one, two, and three lens arrays doesn't really take away from the fact that what Boeing, what Honeywell was offering in June of 1990,  was a two-lens array structure. Okay, well, we have the argument. Thank you, Mr. Rosenthal. Mr. Lurken, we'll enlarge your time. We've run it over on both sides. Thank you, Your Honor. First of all, let me just address the issue of one-lens array reduction. The court can find that in the record at volume 4A07929 and A081. A07930, single-lens array reduced to practice December 21 of 1989. So it's not the case that Inventor Yakumo had abandoned it. She'd simply moved on to testing dual-lens arrays. Secondly, the district court, and I don't feel like I've really addressed your question yet, Judge Proust, and what's bothering you about whether there's a dispute as to whether two-lens arrays were offered in that Honeywell proposal. And I'd like to just take one more shot at it and give you one thing to consider on that. The district court itself, when it looked at the drawings in that Honeywell proposal, said in its order that the diagram does not necessarily inform anyone as to how many lens arrays are contained in the assembly. And that's with reference to an assembly at appendix volume 2A02165, but there are many examples like that. And so it's an assumption, first of all, that Honeywell thought the two-lens array was best, but even then it's described in that proposal. It is not. And then from there where I would go is to design authority was retained by Honeywell throughout the program. And I'll try to find my... Well, I don't have the exact site here. It's in our brief. And that design authority continued all the way until after the bar date. And I would suggest to the court that you could look at appendix A07321, that's volume 4, and it talks about the design baseline for something called the critical design review. And what it says is the baseline is defined by the software, hardware, and system requirements, documents, and design specifications and drawings. It is approved at the critical design review. That takes place almost a year after the bar date. And so what I'm urging to the court is that, you know, I believe the district court fundamentally misapprehended the structure of this contract. And, you know, at the time Honeywell responded to the statement of work, it said, yes, we have a number of working models. We know how to tailor light. We know how to work with luminance. We can solve this problem. But then the parties embarked on a very long and involved and careful approach to finding the right solution. And that's why we say there was no offer of any actual device that met claim 3 until well after the bar date. And I think that plays directly into the court's policy concerns. This was not Honeywell out in the marketplace trying to sell a two lens array unit and develop a market and extend their patent monopoly by holding on to the patent application. This was all done in a confidential environment. And it was an attempt for these two companies to work together and solve an unknown problem. And if I could just point the court to two items of Inventor McCartney's testimony that I think refutes this whole idea that when they went into the Honeywell proposal, they knew it was going to be two lens arrays. First, at appendix 00639, that's involved in one, he testified, we were in no sense ready to deliver some off-the-shelf, ready-to-go, put-this-into-your-airplane-of-any-kind solution of any kind. Then he was asked, okay, how about just the directional diffuser aspect of the flat panel displays? Were those ready? Witness? No. And there was, in fact, a subsequent effort to define what might be suitable for the airplane after this proposal. So as Your Honor observed, it's a very general statement in the Honeywell proposal that we will give you the benefits of what we have learned. But the specific solution was a black box until you got to after the bar date. If I could make just one comment on claim construction, and then I'll sit down. I would urge the court to reverse the district court's claim construction. The district court added the words rotating. I think that's probably inappropriate on rebuttal since we haven't had a chance to argue. Agreed. Thank you. Thank you. Thank you all. Thank you, Mr. Lewick, Mr. Kuniski, Mr. Wilson. All the cases taken under submission.